UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Gerald Richter and Charlene Richter,

      Plaintiffs,

  v.

ITW Ransburg Electrostatic Systems Group
and American Industrial Corporation,

      Defendants.

**MEMORANDUM OPINION
AND ORDER**
Case No. 03-6083 ADM/AJB

_____

Robert P. Christensen, Esq., Robert P. Christensen, P.A., Minneapolis, MN, and James O. Miller, Esq., Miller Law Office, Edina, MN, appeared for and on behalf of Plaintiffs Gerald Richter and Charlene Richter.

Mark P. Hodkinson, Esq., Bassford Remele, P.A., Minneapolis, MN, appeared for and on behalf of Defendant ITW Ransburg Electrostatic Systems Group.

William L. Davidson, Esq., Lind, Jensen, Sullivan & Peterson, P.A., Minneapolis, MN, appeared for and on behalf of American Industrial Corporation.
_____

## I. INTRODUCTION

On March 30, 2005, oral argument before the undersigned United States District Judge was heard on Defendant ITW Ransburg Electrostatic Systems Group ("Ransburg") and Defendant American Industrial Corporation's ("AIC") Motions for Summary Judgment [Docket Nos. 40, 35]. In its Amended Complaint [Docket No. 3], Plaintiffs Gerald Richter and Charlene Richter ("the Richters") allege claims for strict liability, negligence, and breach of warranty. Defendants' Motions for Summary Judgment are granted.

## II. BACKGROUND

At the time of the accident that forms the basis of this litigation, Plaintiff Gerald Richter

1

was employed by Andersen Windows/Andersen Corporation ("Andersen"). The Andersen facility in Bayport, Minnesota employs numerous electricians and more than fifty engineers. Hodkinson Aff. [Docket No. 43] Ex. G at 161, Ex. L at 18. The plant in Bayport includes electrostatic paint lines which apply paint to windows. In general, when constructing an electrostatic paint line, Andersen's practice was to purchase the reciprocator – the device which applies the paint – from a vendor or manufacturer. Hodkinson Aff. Ex. G at 45-46. Andersen would then design controls and the system that raised and lowered the reciprocator inside the paint booth. Id. Andersen would generally purchase electrical components and integrate the components into the paint lines. Id.

Ransburg is a designer and manufacturer of electrostatic finishing equipment and components. Ransburg has supplied Andersen with numerous products which Andersen has acquired either directly from Ransburg or through a distributor. AIC is, on occasion, hired by Andersen to consult and assist with various projects at Andersen's manufacturing center.

In 2000, Andersen undertook a project to upgrade its electrostatic finishing equipment. Specifically, Andersen sought to upgrade the method of mixing paint fluids before application by the electrostatic finishing equipment. Andersen engaged AIC to assist with the acquisition and assembly of the necessary equipment. Kristy Williams ("Williams"), an Andersen engineer, was chosen to manage the project, including the selection of equipment and vendors. Bour Aff. [Docket No. 38] Ex. 3 at 24. Ultimately, Williams chose to install Ransburg 2K 880 meter mix machines. Id. Williams was assisted by Ronald Schactner ("Schactner"), a retired Andersen engineer who provided consulting services to Andersen. Id. at 34. AIC assisted with the acquisition and assembly of a programmable logic controller that utilized software to control the meter mix machines. Williams continued to manage the project until she left Andersen in

January 2001, at which time Ben Adamson ("Adamson") took over as project manager.

Andersen and AIC's agreement was reduced to writing ("the Agreement"). Bour Aff. Ex. 4. The Agreement provided that the actual installation of the equipment would be performed by Andersen. Id. Additionally, Andersen was to provide all the hardware, materials, and labor for the project. Id. All the electrical work was performed by Andersen's own electricians or Commonwealth Electric. Bour Aff. Ex. 3 at 58, 69. In late 2000, the new meter mix components were installed on electrostatic paint lines ("Paint Lines") Nos. 5 and 6. A few months later, in the spring of 2001, installation began on Paint Lines Nos. 3 and 4. When the installation of the new components was completed on Paint Line No. 4 in July 2001, AIC tested the system by comparing the actual wiring to the planned drawings. Bour Aff. Ex. 5 at 124, Ex. 6 at 22-28. AIC found all the wiring to correspond with the wiring diagrams, including the hardwiring and the wiring for the programmable logic controller. Bour Aff. Ex. 6 at 25-28. Ransburg manufactured the meter mix components and later provided some level of training to Andersen, but it was not involved in the planning, installation, supervision, or operation of the Paint Lines. Hodkinson Aff. Ex. J at 45-46, 72.

Shortly after the installation of the new meter mix components on Paint Line No. 4, the high voltage power line began malfunctioning. Bour Aff. Ex. 6 at 23. After examining the Paint Line, AIC determined a device on the control board was potentially responsible for the problem. Id. at 25. Ultimately, AIC determined the meter mix components were wired correctly, and therefore concluded the high voltage problem was unrelated to the new equipment. Id. at 23-28.

In the fall of 2001, Andersen decided to rewire the control panel on Paint Line 4. Hodkinson Aff. Ex. G at 65-69. The rewiring, performed by Robert Kammann ("Kammann"), an Andersen engineer, and Paul Lessard ("Lessard"), an Andersen electrician, was performed on

November 8, 2001.  Id. at 65-69; Hodkinson Exs. B, C.  During the rewiring, an error occurred. Hodkinson Exs. A, B, C, and G at 108-09, 179-80, 192.  As a result of the error, when the reciprocator was lowered in Paint Line No. 4, the high voltage power was shut off in Paint Line No. 3.  Id.  Additionally, the safety interlocks in Paint Line No. 4, including the high voltage power, were disabled.  Id.

      Plaintiff Gerald Richter began his career at Andersen in 1987 as a "paint line helper," eventually moving to the position of "paint line operator" in 1990.  Hodkinson Aff. Ex. H at 25-26.  As part of his duties, Richter was responsible for cleaning portions of the Paint Line, including the reciprocator, four times per shift.  In order to clean the reciprocator (a paint disk driven by a motor assembly and charged with high voltage), a paint line operator was required to shut down portions of the Paint Line, including the high voltage power.  According to safety procedures, the preferred and safest method of shutting down the high voltage power was to turn off the high voltage power at a control box and attach a grounding rod to the reciprocator motor. Id. at 40-42, 224.  However, Richter's practice instead was to lower the reciprocator within the paint booth.  Normally, this triggered a safety interlock which turned off the high voltage power to the reciprocator.  Id. at 31-35.  Before entering the paint booth, Richter's practice was to check the indicator light which confirmed that the high voltage power was off.  Id. at 34-35.

      On November 8, 2001, Richter began his shift at 11:00 p.m.  When he cleaned the reciprocator, instead of following the proper procedure for turning off the high voltage power supply, Richter employed his usual method of having the interlock system cut power to the reciprocator prior to cleaning it.  Id. at 82.  When Richter entered the paint booth, he received a shock.  Id. at 81-86.  On the morning of November 9, 2001, following the completion of Richter's shift, the engineering staff was notified that Richter had been shocked on Paint Line

No. 4. An examination of the wiring performed by Kammann and Lessard the previous day revealed the wiring error which led to Richter's shock. Hodkinson Aff. Exs. 68, 123, 125. In the months following the shock, Plaintiff reported numerous injuries to his doctors, including burns, aching joints, memory deficits, right arm and leg numbness, and worsened eyesight. Bour Aff. Ex. 11.

### III.  DISCUSSION

**A.    Motion for Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Andersen v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Andersen, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.    Products Liability Claims**

Under Minnesota law, a plaintiff asserting a valid products liability claim must satisfy the following elements: (1) the [product] was in a defective condition unreasonably dangerous for its intended use; (2) the defect existed when the [product] left [defendant's] control; and (3) the defect proximately caused [plaintiff's] injuries. Patton v. Newmar Corp., 538 N.W.2d 116, 119-

20 (Minn. 1995). When a products liability suit is based on failure to warn, the question of whether a duty to warn of a danger in a product exists is a matter of law. Germann v. F.L. Smithe Mach. Co., 395 N.W.2d 922, 924 (Minn. 1986). Whether or not a defendant has a duty to warn is dependant on the foreseeability of the injury. Westerberg v. School District 792, Todd County, 148 N.W.2d 312, 317 (Minn. 1967). Finally, the Third Circuit has set forth a test for determining liability when substantial contributors to a defective condition exist: (1) trade custom; (2) which party is best acquainted with the design problems and safety techniques in question; and (3) practicality. Verge v. Ford Motor Co., 581 F.2d 384, 386-87 (3rd Cir. 1978).

Defendants argue that Plaintiffs can not establish that Ransburg or AIC delivered a defective product. Moreover, Defendants aver that even if the Richters could establish a defect, the claims fail because they can not demonstrate the defective product was the proximate cause of Gerald Richter's injuries.

### 1. Defective Product/Design

Defendants argue that no evidence has been proffered to demonstrate that any product at issue is defective. Plaintiffs allege the omission of lock-out switches, a hard-wired interlock, and other safety devices and warnings render the entire electrostatic painting system defective. In support of this contention, Plaintiffs offer two expert reports.[1] Miller Aff. [Docket No. 50] Exs. 66, 67. Both reports conclude that Ransburg and AIC both were responsible for the lack of lock-out switches within easy access of the paint booth operator. Miller Aff. Ex. 66 at 6, Ex. 67 at 10. Moreover, the experts opine the Paint Lines were missing certain lock-out switches required by

---

[1] Plaintiffs and Defendants argue over whether the two expert reports were properly submitted for consideration in evaluating these Motions. Because consideration of the expert reports does not affect the outcome of this Motion, the Court will assume, without deciding, that the reports were properly submitted.

American National Standards Institute and Occupational Safety and Health Administration regulations. Id.

In response, Defendants aver that, contrary to the expert reports, Andersen was the chief engineer of the Paint Lines. Although Ransburg has supplied equipment to Andersen for over forty years, Andersen has always controlled the design of the electrostatic paint lines. Hodkinson Aff. Ex. G at 46. Because Andersen was the chief designer of the Paint Lines, Defendants argue they can not be held responsible for design defects contained in the Paint Line operation. In fact, when AIC was consulted regarding the meter mix upgrades, Andersen had prepared plans for the upgrades which had been reviewed by Andersen's safety, engineering, and electro-engineering departments. Bour Aff. Ex. 3 at 24, 152. Moreover, the scope of AIC's consulting was the subject of the Agreement between AIC and Andersen. Bour Aff. Ex. 4. Additionally, it is undisputed that Ransburg was not involved in the planning or design of the meter mix upgrade; rather, it merely manufactured the components involved in the upgrade. Hodkinson Aff. Ex. G at 46.

More specifically, Defendants argue the Paint Lines were well equipped with numerous safety devices. For example, the operator's control panel employed a high voltage disconnect. Hoss Aff. [Docket No. 66] Ex. F. at 44. Additionally, the main high voltage disconnect was located on the high voltage control panel, located feet from the paint booth operator. Id. These disconnects were designed by Andersen. Hodkinson Aff. Ex. G at 52-53. Prior to November 2001, Andersen had lock-out/tagout procedures in place for several years. Hoss Aff. Ex. G at 66.

In sum, the evidence clearly demonstrates that while Ransburg and AIC both assisted Andersen in constructing its electrostatic paint lines, Andersen has always maintained control

7

over the design and installation procedures. In applying the Third Circuit factors to whether "contributors" to a product are liable, there is no evidence as to trade custom. However, as to the second and third factors, it is impractical to expect Defendants to be responsible for safety on the entire paint line, when Andersen retains direct control over the design and maintenance of the system. Thus, there is no dispute that Andersen was in a better position to assess what safety devices were required for the system. Therefore, the responsibility for the design of the system and any accompanying defects can not be borne by Defendants. Verge, 581 F.2d at 386-87. The evidence is that the design work for the meter mix project was completed by Andersen, and that both Defendants completed the tasks for which they contracted with Andersen. As a result, Defendants can not be held liable for the defects alleged by Plaintiffs.

    **2.**    **Causation**

In addition to arguing that Plaintiffs can not demonstrate a defect, Defendants aver that Plaintiffs have not proffered sufficient evidence to demonstrate that Richter's injuries were proximately caused by Defendants' actions. As set forth in Minnesota case law, proximate cause is an essential element of a products liability claim. Patton, 295 N.W.2d at 924; see also Bilotta v. Kelley Co., Inc., 346 N.W.2d 616, 623 n. 3 (Minn. 1984) (proximate cause required in strict liability products liability context); Hudson v. Snyder Body, Inc., 326 N.W.2d 149, 157 (Minn. 1982) (finding same in negligent products liability context); Farr v. Armstrong Rubber Co., 179 N.W.2d 64, 69 (Minn. 1970) (finding same in breach of warranty products liability context). "As a practical matter, legal responsibility must be limited to those causes which are so close to the result, or of such significance as causes, that the law is justified in imposing liability. This limitation is not a matter of causation, it is one of policy." Lewellin v. Huber, 465 N.W.2d 62, 65 (Minn. 1991). Additionally, a plaintiff seeking to recover under strict liability bears the

burden of demonstrating his injury was not caused by mishandling of the product in question. Magnuson v. Rupp Mfg., Inc., 171 N.W.2d 201, 206 (Minn. 1969). This includes a showing that the injury was not caused by any voluntary, unusual, or abnormal handling. Id.

In the instant case, there is no factual dispute about the events that led to Richter being shocked in the paint silo. Andersen has conceded that an error in the wiring work carried out by Kammann and Lessard led to the shock. Hodkinson Aff. Exs. A, B. There is no allegation or evidence that AIC or Ransburg was aware of Andersen's plans to undertake the wiring work, nor did either Defendant plan, supervise, or otherwise assist in the faulty wiring. Moreover, Andersen is a sophisticated entity that employs numerous professional engineers and electricians. There is no genuine question raised that but for the wiring error, the accident would not have occurred. Consequently, Plaintiffs can not demonstrate proximate cause. Even assuming, *arguendo*, that defects did exist in the meter mix components, those defects were unrelated to the miswiring by Andersen employees. Moreover, the electrostatic paint line operated without incident for months following the installation of the meter mix components.

Not only do Plaintiffs fail to demonstrate proximate cause, they can not overcome the superseding, intervening cause which was the direct result of Richter's injuries. Under Minnesota law, an intervening cause is considered to be superseding if: (1) its harmful effects occurred after the original negligence; (2) the intervening cause was not brought about by the original negligence; (3) the intervening cause actively worked to bring about a result which would not otherwise have followed from the original negligence; and (4) the intervening cause was not reasonably foreseeable by the original wrongdoer. Canada v. McCarthy, 567 N.W.2d 496, 507 (Minn. 1997).

Here, Defendants allege the faulty wiring performed by Andersen is a superseding,

9

intervening cause. The first element is not in dispute; the wiring leading to Richter's injury took place in November 2001, months after the completion of the meter mix component installation. As to the second element, Andersen's decision to rewire a portion of the electrostatic Paint Line was unrelated to the alleged failure of Defendants to install certain safety devices on the paint lines. Accordingly, Andersen's faulty wiring can not be attributed to the alleged negligence.

In considering the third element, as discussed previously, the wiring error was the but for cause of Richter's injuries. If the wiring had been done correctly, or not at all, it is undisputed that Richter would not have been shocked on the day in question. In response, Plaintiffs attempt to shift the responsibility for the wiring to Defendants, claiming both Defendants failed to fulfill their contract obligations by leaving the meter mix project incomplete. However, the evidence cited by Plaintiffs is insufficient to create a material factual dispute. A summary provided by AIC and two order forms provided by Ransburg indicate that Defendants would provide a certain amount of hours of "installation supervision." Miller Aff. Exs. 7, 12, 14. Plaintiffs argue this is evidence of the Defendants' failure to complete the project contract. However, a commitment by Defendants to provide a certain amount of supervision is not a promise to complete the project themselves. Moreover, the Plaintiffs present only conclusions, but no evidence, that the Defendants left the project uncompleted. In fact, despite the implication of Plaintiffs, neither AIC nor Ransburg contracted to do any of the actual installation for Andersen. Bour Aff. Ex. 5 at 70, 111; Hodkinson Aff. Ex. G at 46. Finally, the Plaintiffs do not show that supervision was a part of the final agreement with Ransburg; in fact, there is no evidence that Ransburg was ever at Andersen in connection to the meter mix project.

Finally, it is not reasonable to suggest that Defendants could foresee the faulty wiring by Andersen on an issue unrelated to the meter mix components. As Andersen repeatedly exercised

control over the design and upkeep of the electrostatic paint lines, it would be virtually impossible for Defendants to foresee the myriad issues that could arise with the maintenance of the system.

Consequently, Defendants have successfully demonstrated that Andersen's wiring was a superseding, intervening cause of Richter's injuries. Therefore, even if Plaintiffs could demonstrate the existence of defects in the products supplied by Defendants, they can not prove Defendants' liability. Accordingly, Defendants' Motions for Summary Judgment will be granted on all counts.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant ITW Ransburg Electrostatic Systems Group's Motion for Summary Judgment [Docket No. 40] is **GRANTED**; and

2. Defendant American Industrial Corporation's Motion for Summary Judgment [Docket Nos. 35] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: May 20, 2005.